[Civil No. 1364.   Filed June 12, 1914.]

[141 Pac. 732.]

## W. C. McFADDEN, Appellant, v. WILLIAM G. SHANLEY, Appellee.

1. PARTNERSHIP—SALES BETWEEN COPARTNERS.—A purchase in good faith by one partner of his copartner's interest in the firm property vests the ownership of such property in the purchasing partner.

2. PARTNERSHIP—ACTIONS BY PURCHASER OF PARTNERSHIP PROPERTY.— Civil Code of 1901, paragraphs 3520–3524, prohibiting suit by a partnership trading under a fictitious name upon any contract, where the firm has not filed a certificate of partnership as required, does not declare the contract invalid or prohibit assignment of the claim; and hence, where one of two copartners assigned his interest in the firm to the other, the remaining copartner may sue upon a firm contract in his own name, although the required certificate was not filed.

   [As to validity of contract entered into by partnership which has not complied with statutes, see note in Ann. Cas.-1913C, 700.]

3. SALES—CONTRACTS—BREACH.—Where plaintiff purchased beef cattle, he cannot be compelled to receive cattle not ready for immediate butchering.

4. SALES—MEASURE OF DAMAGES—SELLER'S BREACH OF CONTRACT.— In case of breach of a contract of sale, the party injured should

be made whole so far as money can do it; the damages recoverable being the actual loss sustained, provided it is such as would follow from the breach, and which, under the circumstances, might be presumed to have been in contemplation of the parties.

5. PARTNERSHIP—CONTRACTS—BREACH—DAMAGES.—Where a partnership engaged in butchering contracted for the purchase of beef cattle which were necessary to supply their trade, the ordinary consequences of the failure of the seller to supply the cattle must be considered to have been within the contemplation of the parties to the contract.

6. DAMAGES—BREACH OF CONTRACT—MEASURE OF DAMAGES—ACTUAL COMPENSATION.—In actions for breach of contract, the circumstances of each case must determine what measure of damages should apply, having in view always the giving of actual compensation for the actual loss.

7. SALES—BREACH OF CONTRACT—MEASURE OF DAMAGES.—Defendant, who agreed to sell plaintiff a large number of beef cattle, breached his contract, and plaintiff, who was engaged in the butchering business, obtained cattle in the vicinity which, with transportation, cost a large sum in excess of the contract price. *Held*, that, as plaintiff was bound to minimize the result of the breach as far as possible, and as there was no regular market for cattle at the point of sale, plaintiff's damages were not restricted to the difference between the contract price and the market price of cattle at the time and place of delivery under the contract, but were the difference between the contract price and the value of cattle at place of delivery within a reasonable time after breach.

APPEAL from a judgment of the Superior Court of the County of Gila. G. W. Shute, Judge. Affirmed.

The facts are stated in the opinion.

Mr. F. C. Jacobs and Mr. Jay Good, for Appellant.

Messrs. Rawlins & Little, for Appellee.

FRANKLIN, C. J.—Action for the alleged breach of a contract. There was a prayer for judgment in the sum of $3,707.03. The appellant set up a counterclaim in the action based on a breach of the contract sued on, and prayed for judgment in the sum of $614. The case was tried to a jury, which returned a verdict in favor of appellee in the sum of $1,425.51; judgment thereon being given accordingly.

On September 3, 1912, William G. Shanley and Harry Sultan were partners engaged in the wholesale and retail butcher business at Globe, Arizona, under the firm name and style of the Pioneer Meat Company. On that date the partnership made a contract with W. C. McFadden, the appellant who was defendant below, and the breach complained of is based on this contract. It appears that on December 9, 1912, the partnership was dissolved; Harry Sultan conveying all of his interest in the company to the appellee, who was plaintiff below, and who prosecuted the action as the individual who became the sole owner of all the partnership property.

It is claimed that there was a want of capacity in the plaintiff to maintain the action because he was a member of the Pioneer Meat Company, which entered into the contract in question, and that the firm had not filed any certificate of partnership, as required by title 51, Revised Statutes of Arizona of 1901.

Observe that the action is not maintained by the persons composing the partnership, but is maintained by an individual who became vested with the ownership of all the property of such firm before the suit was brought. The chapter cited does not declare that a contract made by such a partnership is invalid and unenforceable by reason of its failure to comply with the statute; but the penalty attached by the statute for such failure is a legal incapacity to maintain an action by the persons transacting business as a copartnership under a fictitious name, or a designation not showing the names of the persons interested as partners. There is no disability to make contracts or have transactions; but the disability attached is a want of capacity to maintain any action upon or on account of any contract made and transactions had in their partnership name until they have first filed the certificate required. Upon compliance with the statute the disability is removed, and the removal of such disability relates back to embrace any contract or transaction had prior to the compliance, and of course comprehends all such contracts and transactions subsequent thereto. We must determine, therefore, if the statutory disability attaches to an assignee of such firm, even though such assignee be a member of the firm within the inhibition of the law.

Purchases by one partner of his copartner's interest in the firm are of frequent occurrence, and when made in good faith operate to vest the ownership of firm property in the purchasing partner.   30 Cyc. 456.

The good faith of this transaction, in which one member of the firm sold all of his interest in the firm's property to another member, is not questioned.   The provision in the statute prohibiting the maintenance of an action by such a partnership does not preclude the assignment of a claim held by the partnership, nor does it prevent the assignee of any such claim from maintaining an action thereon in his own name.   *Cheney* v. *Newberry*, 67 Cal. 126, 7 Pac. 445; *Wing Ho* v. *Baldwin*, 70 Cal. 194, 11 Pac. 565.   That such assignee was a member of the firm is immaterial.   *Gray* v. *Wells*, 118 Cal. 11, 50 Pac. 23; *Trudel* v. *Butori*, 19 Cal. App. 584, 127 Pac. 76.

It appears that the firm did file a certificate in an attempt to comply with the law, and, while it is unnecessary for us to pass upon its sufficiency in this case, we might observe *en passant* that the record discloses a substantial compliance with the requirement of the statute in this behalf.   There is no merit in this point.   We shall now have surcease of it and pass on to others.

By the contract McFadden obligated himself to deliver to the Pioneer Meat Company, at its slaughter-house about three miles hitherward of Globe, 300 head of cattle, with the privilege on his part of delivering up to 400 head.   The kind and quality of the cattle, and the price per pound to be paid therefor, were specified in the contract.   Deliveries were to be made as follows: September 20 to October 1, 1912, 75 to 125 head of cattle.   October 20 to November 1, 1912, 75 to 125 head of cattle.   November 20 to December 1, 1912, 75 to 125 head of cattle.   The first delivery was duly made and accepted, and the controversy here arose over the second one. There was no attempt to make the third delivery.

One of the specifications of the contract was that the cattle delivered were to be good, fat, beef cattle, ready for immediate use, and this specification is the axis on which the alleged breach of the contract revolves.

It appears that on November 1, 1912, the appellant delivered to the Pioneer Meat Company at its slaughter-house near Globe about 86 head of cattle, and the delivery was refused

because, as appellee contends, the quality of the cattle did not
meet the specifications of the contract, in that said cattle were
not good, fat, beef cattle, ready for immediate use.    Upon
this issue the record presents a sharp conflict in the evidence.
Its tenor ranged from that of one witness engaged in the
butchering business for 19 years, who testified that the cattle
when delivered were not fit for beef, "some of them had hips
you could hang your hat on," to that of another who stated
the cattle were good, fat, beef cattle, ready for immediate use.
The jury was competent, and, indeed, that was its province to
determine the weight to be given the several witnesses on the
subject.

Of course the company was not bound to receive or pay for
the cattle delivered, if they were not of the kind and quality
specified in the contract.    The contract having been broken,
the person injured by the breach ought to be placed, as far
as money can do it, in the same position as he would have been
in if the contract had been filled.    Where the carrying out
of the contract would give one of the contracting parties the
use or enjoyment of a particular thing, and he has lost it
(without fault on his part), the damages he should be en-
titled to would be the value of that which he has lost.    The
important question we have to deal with is: What is the prin-
ciple upon which the damages in such a case are to be as-
sessed?

In the leading case of *Hadley* v. *Baxendale,* 9 Exch. 341,
the general rule on this subject is stated as follows:

"Damages recoverable on a breach of contract are measured
by the actual loss sustained, provided such loss is what would
naturally result as the ordinary consequence of the breach, or
as a consequence which may, under the circumstances, be pre-
sumed to have been in the contemplation of the parties as the
probable result of a breach."

This case is the polar star to which the courts of both
England and America have looked for guidance in ascertain-
ing the true rule as to the measure of damages for breach of
contract.    It is often referred to by Sedgwick and by Suther-
land in their treatises on Damages, and Mr. Lawson cites it
as the leading case which has been followed in all the courts
of the United States.

Mr. Elliott says: "The term 'damages' means the pecuniary compensation or indemnity which the law awards to an injured party for the breach of a contract or a duty. They are based on the idea of a loss which must be made good; they are that which is given or adjudged to repair the loss. The test, in general, for the measurement of these damages in actions for breach of contract is compensation, and this intends that the party injured shall be put in as good condition as he would have been if the injury would not have been inflicted." Elliott on Contracts, sec. 2120.

In cases where actual loss is sustained, the basic idea then is compensation. But how shall we arrive at a just and fair compensation to which an injured party is entitled in a suit for the breach of a contract for failure to deliver personal property of a stated quality sold at a specified price, and for a particular use? It is most important to consider this, for it is the vital factor in the case.

The general rule is that the measure of damages is the difference between the contract price and the market price at the time and place fixed for the delivery. This general rule, however, must not be taken as one subject to no exception or modification. What if there should be no market at the time and place fixed for delivery? Can the seller, omitting to do that which his contract obligated him to do, thus escape liability to respond in actual damages to the other party? Mr. Benjamin, after reviewing a number of authorities, says:

"It is submitted that these decisions establish the following rules in cases where goods have been bought for the purpose of resale, and there is no market in which the buyer can readily obtain them:

"I. If, at the time of the sale, the existence of a subcontract is made known to the seller, the buyer, on the seller's default in delivering the goods, has two courses open to him: (1) He may elect to fulfill his subcontract, and for that purpose go into the market and purchase the best substitute obtainable, charging the seller with the difference between the contract price of the goods and the price of the goods substituted. (2) He may elect to abandon his subcontract, and in that case he may recover as damages against the seller (a) his loss of profits on the subsale, and (b) any penalties he may be liable to pay for breach of his subcontract; but, if

the amount of the penalties has not been made known to the seller, the buyer is not entitled to recover their amount as a matter of right, but the jury may, if the penalties are reasonable, assess the damages at that amount. It is further submitted that, in order to entitle the buyer to claim exceptional profits arising from a subsale, express notice of the amount of such profits must have been given to seller at the time when the contract was made, under circumstances implying that he accepted the contract with the special condition attached to it.

"II. If, at the time of the sale, the existence of a subcontract is not made known to the seller, a knowledge on his part that the buyer is purchasing with the general intention to resell, or notice of the subcontract given to him subsequent to the date of the contract, will not render him liable for the buyer's loss of profits on such subcontract; the buyer may either procure the best substitute for the goods as before and fulfill his subcontract, charging the seller with the difference in price, or abandon the subcontract and bring his action for damages, when the ordinary rule, it would seem, will apply, and the jury must estimate, as well as they can, the difference between the contract price and the market value of the goods, although there is no market price, in the sense that there is no place where the buyer can readily procure the goods contracted for.

"III. In every case the buyer, to entitle him to recover the full amount of damages, must have acted throughout as a reasonable man of business, and done all in his power to mitigate the loss." Benjamin on Sales, 6th Am. ed., sec. 1327.

Mr. Elliott says that: "Where there is an available market, the measure of damages, ordinarily and in the absence of special circumstances, is the difference between the contract price and the market or current price of the goods at the time or times when they ought to have been delivered, or, if no time was fixed, then at the time of refusal to deliver. This contemplates a fair market, and, if no market exists at the place, the value at the market nearest available, plus the cost of transportation, is generally taken in its place." Elliott on Contracts, sec. 5108.

XVI Ariz.—7

Mr. Sutherland, in his treatise on Damages, ninth edition, section 739, says: ''If there is no market value at the place of delivery, the true value of the goods at the time fixed for delivery is to be shown by the best evidence possible. If there is a neighboring market, the price at such market is competent evidence, after making due allowance for the cost of transportation between points. Whether such cost should be added to or subtracted from the price in the nearest market depends on circumstances. If the goods were bought to be used at the place of delivery, the buyer can be compensated only by adding such cost to the price. This would represent the cost of replacement.''

In support of the text the author, among other cases, refers to *Gaunt* v. *Ralston Purina Co.,* 198 Fed. 60, 117 C. C. A. 168, where the measure of damages for breach of the seller of a contract for sale of grain to be delivered at a certain place was stated to be the difference between the contract price and the market price of the same quality of grain at the place of delivery at the time of breach, if there was a market price at such time and place, and, if there is no market, the difference between the contract price and what it cost the buyer to procure the grain delivered there from the most accessible market where the buyer purchased the same in a reasonable and diligent manner.

It was said in the case of *Cahen* v. *Platt,* 69 N. Y. 348, 25 Am. Rep. 203, speaking on this subject in an action by the seller:

''The general measure of damages in such a case is the difference between the contract price and the market price at the time and place of delivery. This measure is adopted as one that will generally give complete indemnity to the seller. He can dispose of the commodity contracted to be sold at the market price, and his damage will be the difference between the price thus obtained and the price he would have received if the contract had been performed. Evidence as to the price need not be confined to the precise time when the contract was to have been performed. It may sometimes be impracticable to show the price at the precise time, and hence evidence of the price for a brief period before and after the time may be given, not for the purpose of establishing a market price at any other time, but for the purpose of

showing as well as practicable the market price on the day the contract was to have been performed. So it may not always be practicable to show the price at the precise place of delivery. There may have been no sales of the commodity there, and hence evidence of the price at places not distant or in other controlling markets may be given, not for the purpose of establishing a market price at any other place, but for the purpose of showing the market price at the place of delivery."

The Pioneer Meat Company was engaged in the wholesale and retail meat business at Globe. The contract called for the delivery at the slaughter-house of the company of good, fat cattle, ready for immediate use. The animäls were thus designated for the special purpose for which they were needed to supply the trade of the company, and the ordinary consequences of a failure to have the cattle for the intended use must be held to have been within the contemplation of the parties to the contract. The evidence discloses: That at the time the contract was broken there were no cattle to be had at the place of delivery or at Globe. That there was no market for cattle at Globe. That buyers were offering 6 and 7 and 7½ cents per pound for such cattle, but none were procurable. That the firm, in order to supply its trade and keep its business going, procured 228 head of cattle in the Gila Valley in the vicinity of Globe, and paid 6½ cents per pound for 131 head, and less than 6 cents per pound for the balance. The difference in the price paid, with transportation expenses of the cattle substituted added, and the price under the contract, amounted to the sum of $3,251.03. It appears that the demands of the firm's business and the situation of the cattle market required it to procure the substituted cattle in the manner pursued. We think, under the circumstances of this case, that the firm was justified in avoiding so far as it could the consequences of the breach and procuring the most available substitute in the manner open to it; indeed, it was perhaps the duty of the firm so to do. And in procuring the substituted cattle by the method pursued, there does not appear any lack of good faith in the transaction, nor is there any want of reasonable diligence and dispatch apparent in the premises on the part of the firm. The verdict of the jury has so determined.

The appellant requested an instruction in substance defining the measure of damages to be the difference between the contract price and the market value of property of the same kind and quality at the place where the delivery was to be made under the contract at the precise time of delivery specified in the contract. We think, under the circumstances of this case, the court was justified in refusing to place such a limitation in the instruction. The court modified the instruction so as to tell the jury that they might find the value within a reasonable period of that time. It was impracticable to confine the evidence as to the market value of the cattle to the place where and the precise time when the contract was to have been performed. There was no market at the place of delivery, no cattle being sold and purchased there when the contract was to have been performed; and it was therefore impracticable to confine the evidence as to the market value of the cattle to the precise time and place of delivery.

The court took the view that the plaintiff should have a reasonable time to go into the market and substitute other cattle in the place of those not delivered under the contract, and, in substance, instructed the jury that the measure of damages would be the difference between the contract price and the market value of property of the same kind and quality at the place of delivery and within a reasonable time after the contract should have been performed, but, in the event that there is no market value of such property at the time and place of delivery, then the measure of damages is the difference between the contract price and the market value at the nearest market from the place of delivery, not to exceed, however, the actual price paid by the plaintiff for the cattle he substituted for those not delivered under the contract.

In actions for breaches of contract, the circumstances of each case must determine what measure of damages should apply, having in view always the giving actual compensation for actual loss. *Slaughter* v. *Marlow,* 3 Ariz. 429, 31 Pac. 547.

When the property contracted for is not readily obtainable on the market at the place of delivery under the contract, it has been held that the purchaser may recover the difference between the agreed price and the actual cost of procuring similar property by due diligence. *Vulcan Iron Works Co.* v.

*Roquemore*, 175 Fed. 11, 99 C. C. A. 77; *McFadden* v. *Henderson*, 128 Ala. 221, 29 South. 640; *Den Bleyker* v. *Gaston*, 97 Mich. 354, 56 N. W. 763; *Rhind* v. *Freedley*, 74 N. J. L. 138, 64 Atl. 963; *Miller* v. *Stern*, 25 Misc. Rep. 690, 55 N. Y. Supp. 765; *Hassard-Short* v. *Hardison*, 117 N. C. 60, 23 S. E. 96.   See, also, *Semon Bache & Co.* v. *Coppes, Zook & Mutschler Co.*, 35 Ind. App. 351, 111 Am. St. Rep. 171, 74 N. E. 41; *Piowaty* v. *Sheldon*, 167 Mich. 218, Ann. Cas. 1913A, 610, 132 N. W. 517; *Armeny* v. *Madson & Buck Co.*, 111 Ill. App. 621.

The principle just stated seems to have been recognized by the appellant, for he requested, and the court gave to the jury, the following instruction, to wit:

"You are hereby further instructed that it is the duty of the plaintiff, where a defendant has committed a breach of a contract to deliver property at a certain time and place, by reasonable diligence to lessen damages that might be incurred by him by reason of such breach.   Therefore, if you find from the evidence that the defendant, McFadden, did commit a breach of his contract by failing to deliver cattle of the kind and quality mentioned in the contract set forth in plaintiff's complaint herein, and that the plaintiff, by reasonable diligence, could have procured in the vicinity of Globe, where said cattle were to be delivered, other cattle of the same kind and quality as those mentioned in the contract, and at no greater cost and prices than mentioned in the contract, then, and in that event, the plaintiff in this case cannot recover anything more than nominal damages."

The theory of this instruction is that the appellee was involved in a matter dictating good faith and due diligence. So he was, and if, in the exercise of good faith, and with due diligence, he procured in the open market, in the vicinity of Globe, cattle to substitute for those contracted for, and he did not pay more than the market price, we fail to recognize any principle that would preclude him from recovering as damages for the breach of the contract the difference between the price paid and the contract price.

In view of the evidence disclosing that cattle were not obtainable at the place of delivery or at Globe, that there was a good demand for them at the time and place of delivery, and buyers were offering 6, 7 and 7½ cents per pound, and cattle were not readily obtainable at that price, and that the plain-

tiff exercised good faith and reasonable diligence in going into the open market in the vicinity of Globe and purchasing cattle to substitute for those not delivered, the price paid not exceeding the market value of the cattle, but they were bought for less than the market price, we cannot feel persuaded that the instruction was, in the particular complained of, in any wise prejudicial to the rights of appellee. It did not authorize a recovery beyond the principle of actual compensation for actual loss, and we feel that the court determined the measure of damages as best it could under the facts of the case.

While generally the measure of damages ought to be fixed at the time of the breach of the contract, it is not a procrustean rule which the peculiar circumstances of a particular case may not justify some modification thereof. The firm did the best it could to remedy the default of the seller and save the damages as far as possible on account of its business. The prayer was for damages in the sum of $3,707.03, and the verdict was for $1,425.51, and we cannot say it was not justified by either the law or the facts.

Other alleged errors have been pointed out; but, upon a careful consideration of the entire record, we do not feel that there is any matter presented which would justify a reversal of the judgment, nor such as to invite a more extended review.

Judgment affirmed.

CUNNINGHAM and ROSS, JJ., concur.

Application for rehearing denied.

_____

NOTE.—On the question of the measure of damages for breach of a contract for the sale of an article having no market price, see note in 57 L. R. A. 193.

As to the duty to prevent or reduce damages on breach of contract for sale or purchase, see note in 52 L. R. A. 259.